# United States Court of Appeals
## For the First Circuit

Nos.  15-1808; 15-2080

ALFREDO VILLOLDO, individually; GUSTAVO E. VILLOLDO,
individually, and as Administrator, Executor and Personal
Representative of the Estate of Gustavo Villoldo Argilagos,

Plaintiffs - Appellants/Cross-Appellees,

v.

FIDEL CASTRO RUZ, as an individual, and as an official,
employee, or agent of The Republic of Cuba; RAUL CASTRO RUZ, as
an individual, and as an official, employee, or agent of The
Republic of Cuba; THE MINISTRY OF INTERIOR, an agency or
instrumentality of The Republic of Cuba; THE ARMY OF THE
REPUBLIC OF CUBA, an agency or instrumentality of The Republic
of Cuba; THE REPUBLIC OF CUBA, a foreign state,

Defendants - Appellees,

COMPUTERSHARE, INC.,

Trustee - Appellee/Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Thompson, Circuit Judge,
Souter, Associate Justice,[*]
and Barron, Circuit Judge

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Andrew C. Hall, with whom Hall, Lamb and Hall, P.A. was on brief, for Plaintiffs-Appellants/Cross-Appellees.

Michael C. Gilleran, with whom Burns & Levinson, LLP was on brief, for Trustee-Appellee/Cross-Appellant.

Benjamin M. Shultz, Attorney, Appellate Staff Civil Division, United States Department of Justice, with whom Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, Sharon Swingle, Appellate Staff, Civil Division, United States Department of Justice, Lisa J. Grosh, Assistant Legal Advisor, Department of State, of counsel, were on brief, for The United States of America, amicus curiae.

May 12, 2016

**BARRON**, **Circuit Judge**.  These cross-appeals arise from the ongoing efforts by two brothers to satisfy a multi-billion dollar judgment they won against the Republic of Cuba and other Cuban parties.  In the appeal that the brothers bring, they challenge the District Court's ruling that certain assets they seek to attach to satisfy that judgment are not the property of the Cuban government and thus are not subject to attachment in satisfaction of their judgment.  The cross-appeal is brought by the trustee who controls the assets in question.  The trustee challenges the District Court's denial of its motion for attorneys' fees incurred in proceedings concerning whether it had to turn over the assets in question to the brothers.  We affirm the District Court in both appeals.

## I.

The primary legal dispute in this case concerns how the law of foreign relations affects the attempted satisfaction of a judgment.  The judgment itself, however, is not at issue.  Nevertheless, because the circuitous route that led from that judgment to these cross-appeals is relevant to the issues in dispute, we begin by briefly retracing how we got from there to here.

The brothers who are seeking to satisfy the judgment are Alfredo and Gustavo Villoldo, each of whom moved from Cuba to the United States in 1960.  In 2008, they filed suit in Florida state

court and named as defendants: Fidel Castro Ruz; Raul Castro Ruz; the Republic of Cuba; the Cuban Ministry of the Interior; and the Army of the Republic of Cuba (together, the "Cuban defendants").

The brothers' complaint alleged state-law causes of action for economic loss, intentional infliction of emotional distress, and wrongful death. The complaint alleged that after Fidel Castro assumed power, on January 1, 1959, his government began to target the Villoldos. In particular, the complaint alleged that the targeting involved the following actions. Cuban security forces threatened, beat, and arrested both brothers. Cuban officials threatened Gustavo Villoldo Argilagos, the brothers' father, and promised to kill the entire family unless the brothers' father committed suicide and turned his property over to the Cuban government. The Cuban government confiscated Gustavo Villoldo Argilagos's land, company, and bank accounts after he was found dead on February 16, 1959, apparently having committed suicide. And the Cuban government continued to threaten the brothers with assassination even after they fled Cuba for the United States in 1960.

In 2011, a Florida court awarded the brothers a $2.79 billion judgment against the Cuban defendants on their state-law claims. The judgment followed the defendants' default and a bench trial on damages.

Soon thereafter, the brothers sued the Cuban defendants in the Southern District of New York, seeking recognition of the Florida judgment under the Full Faith and Credit Clause of the United States Constitution. U.S. Const. art. IV, § 1. The Cuban defendants defaulted again, and the Southern District of New York awarded the brothers a federal judgement in the amount of $2.79 billion, plus interest.

The brothers then sought to execute the federal judgment, including by pursuing assets located in Massachusetts and allegedly owned by the Cuban government. So, as part of that quest, on May 17, 2013, the brothers registered the New York federal judgment in the District of Massachusetts. And on June 6, 2013, the District Court authorized the brothers to seek attachment. The brothers then served a subpoena on Computershare, Inc., a transfer agent located in Canton, Massachusetts.

The subpoena sought information about any securities accounts controlled by Computershare that were blocked pursuant to the Cuban Assets Control Regulations, 31 C.F.R. Subt. B, ch. V, pt. 515, the Cuba sanctions regime. The brothers hoped to identify accounts that Cuba owns. Computershare produced a chart identifying 383 accounts that had been blocked by the Cuban sanctions regime, which had been opened by 70 different individuals.

Having received that information, the brothers, in December of 2013, filed an ex parte motion in the District Court for a turnover order against Computershare.  The brothers' motion argued that the accounts identified by Computershare had been opened in the 1950s by Cuban nationals, but had since become the property of Cuba by operation of a Cuban confiscatory law.  Thus, the brothers argued that the accounts are subject to attachment in light of the federal judgment from New York.  The brothers requested that the District Court (a) find the accounts subject to attachment and execution; (b) allow the issuance of a trustee summons to Computershare; and (c) establish a procedure to notify potential parties in interest.

The District Court granted the motion, established a detailed notice protocol, and set January 31, 2014, as the deadline for any interested party to file an objection.  The District Court also ordered Computershare to turn over the accounts of any non-objecting parties by February 7, 2014.

Following the District Court's ruling, the brothers served Computershare with a trustee summons.  Computershare filed a trustee answer shortly afterwards.  Computershare contended that the accounts at issue contained three different types of assets: shares of common stock held by physical stock certificates ("certificated shares"); shares of common stock held electronically ("book shares"); and cash.  Computershare asserted

- 6 -

that it could turn over the cash and the book shares but that it could hand over the certificated shares only if the brothers provided a surety bond and the Court made a finding that the original shares were deemed "lost, stolen or wrongfully taken."

Following the passing of the January 31, 2014 objection deadline -- by which time only one objection had been filed -- the District Court, on February 12, 2014, issued a follow-on turnover order. This order required Computershare to turn over the book and cash assets within 60 days. The order did not address the certificated shares. The order also stated that the District Court would set a briefing schedule for the objecting party.

Another flurry of motions followed the February 12 order. As relevant here, Computershare at this point argued for the first time -- in its briefing regarding whether it should be given extra time to comply with the February 12 order -- that the blocked accounts should not be considered the property of Cuba. The United States then filed a statement of interest that also argued that the accounts should not be considered the property of Cuba. The brothers responded that the February 12 turnover order was a final judgment and thus that the District Court lacked the authority to revisit it.

The District Court, however, determined that the February 12 order was not a final judgment. Then, on July 7, 2015, the District Court ruled that -- contrary to the conclusion it had

reached in its original turnover order -- the blocked assets were not the property of the Cuban government, denied the brothers' pending motions, and dismissed the case.

That day, the District Court entered both its memorandum and order as well as a document entitled "Order of Dismissal," which read: "In accordance with the Court's Memorandum and Order dated 7/7/15, it is hereby ORDERED that the above-entitled action be and hereby is dismissed." Three days later, the brothers appealed from the dismissal.

On July 31, 2015 -- 24 days after the dismissal -- Computershare filed a motion seeking attorneys' fees. Computershare argued that the motion was timely because the July 7 "Order of Dismissal" did not satisfy the separate document requirement set forth in Federal Rule of Civil Procedure 58 and so had not started Federal Rule of Civil Procedure 54's 14-day clock for moving for attorneys' fees.

The District Court denied Computershare's motion. The District Court ruled that the July 7 order was a final judgment that satisfied Rule 58's separate document rule and that "Computershare ha[d] not shown good cause or excusable neglect for failing to make a fee request within the required period." Computershare cross-appeals from that denial.

- 8 -

The threshold issue is whether the District Court had the authority to revisit its initial determination that Cuba owned the assets subject to the February 12 turnover order. The parties agree that the District Court did have such authority if the February 12 order was not a final judgment. And so the dispute turns on whether it was. We conclude that it was not.

When "an action presents more than one claim for relief," or involves multiple parties, Rule 54(b) applies. Fed. R. Civ. P. 54(b). And, under that Rule, an order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Id.

The February 12 turnover order did not resolve the brothers' claims against the certificated shares or the claim against any accounts owned by the objecting party. Therefore, under Rule 54(b), that order was not a final judgment.

The brothers make only one argument against this conclusion. They argue that Rule 54(b) should not apply to post-judgment collection proceedings such as this one. Otherwise, they contend, trustees may be forced to turn over assets before they would be able to appeal the turnover order.

Notably, the trustee in this case does not argue that Rule 54(b) must be so read in order to protect the interests of trustees.  And for good reason.  Nothing in the text or history of Rule 54 supports the brothers' construction of the Rule.  Nor, as far as we are aware, does any precedent.  Moreover, the argument fails on its own terms.  Under Rule 54(b), district courts "may direct entry of a final judgment as to one or more, but fewer than all, claims or parties . . . if the court expressly determines that there is no just reason for delay."  Thus, a trustee faced with a turnover order can move to have the order certified as final, even if the turnover of other assets remains to be adjudicated.  See id.

Because the February 12 turnover order was not a final judgment, the District Court was entitled to revisit it.  We thus must address whether the District Court erred in dismissing the case on the ground that the accounts Computershare possessed were not owned by Cuba and so not subject to attachment in satisfaction of the New York judgment.

## III.

There is no dispute that if the accounts subject to the initial turnover order are the property of Cuba, then they are subject to attachment, even though the Foreign Sovereign Immunity Act generally immunizes "foreign state[s]" in United States courts, 28 U.S.C. § 1604, and protects the property of foreign

- 10 -

states from attachment and execution.  Id. § 1609.  The reason is that an exception to the general rule regarding foreign sovereign immunity applies to cases related to terrorism, see id. §§ 1605A; 1610(a)(7); see also Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322, 2337 (codified in relevant part at 28 U.S.C. § 1610 note), and there is no dispute that this exception would apply here.

Thus, the key question for us is whether the accounts are the property of Cuba.  The answer depends on foreign relations law, and, in particular, the scope of what is known as the "act of state" doctrine.  Under that doctrine, "the act within its own boundaries of one sovereign State becomes a rule of decision for the courts of this country."  W.S. Kirkpatrick & Co., Inc. v. Envir. Tectonics Corp., Int'l., 493 U.S. 400, 406 (1990) (quoting Ricaud v. Am. Metal Co., 246 U.S. 304, 310 (1918)(ellipses omitted)); see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 416 (1964).

There is, however, "a well-established corollary to the act of state doctrine, the so-called 'extraterritorial exception.'"  Tchacosh Co., Ltd. v. Rockwell Int'l Corp., 766 F.2d 1333, 1336 (9th Cir. 1985).  Under that exception, "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the

United States.'"  Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 (2d Cir. 1965) (Friendly, J.).

The brothers contend that the assets at issue are Cuba's -- although the accounts were opened by individual Cuban nationals -- by reason of a confiscatory law that Cuba enacted in September of 1959, Law 568.[1]  The brothers contend that Law 568 requires Cuban nationals to repatriate to Cuba any assets held abroad and provides that failure to repatriate those assets results in nationalization of the assets.  And the brothers contend that, under the act of state doctrine, Law 568 must be given effect, as that law, by its terms, confiscates the assets in question because they are located abroad.  In consequence, the brothers argue that the blocked accounts are the property of the Cuban government.

We may assume the brothers' interpretation of Law 568 is sound -- although the United States contends that it is not.  And that is because we conclude that, in light of the extraterritorial exception to the act of state doctrine, Law 568 should not be given effect with respect to the assets at issue.

United States courts have often given effect under the act of state doctrine to foreign sovereigns' nationalizations of assets that are located within their own territories at the time of confiscation.  See, e.g., Sabbatino, 376 U.S. at 417-18, 439.

---

[1] The brothers cite both Law 567 and Law 568, but Law 567 appears to be of little relevance to this case.

Indeed, "[a] confiscation decree . . . is the very archetype of an act of state." Republic of Iraq, 353 F.2d at 50. But the rule is different when the nationalization purports to confiscate assets that are located in the United States at the time that they are putatively taken.

Normally, "our courts will not give extraterritorial effect to a confiscatory decree of a foreign state, even where directed against its own nationals." Maltina Corp. v. Cawy Bottling Co., 462 F.2d 1021, 1025 (5th Cir. 1972) (internal quotation marks omitted, collecting cases). After all, United States law and policy -- as evidenced by the Fifth Amendment of the United States Constitution -- does not support the taking of private property without just compensation. See e.g., Republic of Iraq, 353 F.2d at 51-52.

There might be reason to make an exception to this exception if this were a case in which the executive branch was urging us to give extraterritorial effect in this country to the foreign nation's confiscatory law. See, e.g., United States v. Pink, 315 U.S. 203, 213-14, 234 (1942); United States v. Belmont, 301 U.S. 324 (1937); see also Republic of Iraq, 353 F.2d at 52. But the government is not urging us to do so. Nor is the executive branch even simply silent on the matter. Compare Banco Nacional de Cuba v. Chem. Bank of N.Y., 658 F.2d 903, 909 (2d Cir. 1981) (giving effect to an extraterritorial taking when the United States

- 13 -

apparently did not weigh in and no party asked the Court not to recognize the confiscation) with Republic of Iraq, 353 F.2d at 52 & n.5 (declining to give effect to an extraterritorial taking even when the United States expressly disclaimed an interest in the case). Rather, the United States is urging us not to give extraterritorial effect to Law 568, and we are aware of no precedent for giving extraterritorial effect to a foreign nation's confiscatory law when our own government opposes doing so.

As a general matter, we are required to accord some deference to the executive's position concerning the application of the act of state doctrine, see First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 764-67 (1972) (the opinions cumulatively reflecting eight votes indicate that the view of the executive is due substantial weight), especially given "[t]he Court's more recent justification for the doctrine," which emphasizes that it is "an expression of the domestic separation of powers." Estados Unidos Mexicanos v. DeCoster, 229 F.3d 332, 340 n.11 (1st Cir. 2000) (citing W.S. Kirkpatrick & Co. Inc., 493 U.S. at 404 (noting that the act of state doctrine reflects "'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs" (quoting Sabbatino, 376 U.S. at 423))). And here the government contends that adhering to the extraterritorial exception to the act of state doctrine furthers

- 14 -

United States foreign policy interests by enabling the government to use the blocked assets at issue in connection with ongoing negotiations with Cuba on matters of foreign affairs. As the government points out, if we were to decline to adhere to the extraterritorial exception to the act of state doctrine, Cuba would gain the benefit -- through the reduction of the amount Cuba owes on the judgment against it -- of assets of Cuban nationals that are located in the United States and that have been frozen by the executive branch pursuant to discretion granted by Congress to impose sanctions in order "to curtail the flow of hard currency to Cuba."[2] See Regan v. Wald, 468 U.S. 222, 243 (1984).

The brothers do contend that TRIA -- in making an exception to foreign sovereign immunity -- embodies a policy in favor of allowing victims of terrorism to collect on judgments. But TRIA only tells us that the property that is owned by a foreign state should be used to pay such judgments. See Heiser v. Islamic Republic of Iran, 735 F.3d 934, 938-39 (D.C. Cir. 2013). Nothing in the text or legislative history of TRIA suggests that the extraterritorial exception to the act of state doctrine should be

_____

[2] The brothers argue that the Fifth Amendment does not apply to prevent foreign governments from taking the property of its own citizens, but that is beside the point. See Republic of Iraq, 353 F.2d at 52.

- 15 -

disregarded so that certain assets become the property of the foreign country.[3]  See id.

We thus decline to deviate in this case from the general rule that United States courts will not give extraterritorial effect to a foreign state's confiscatory law.  See Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd., 840 F.2d 72, 75 (D.C. Cir. 1988); United Bank Ltd. v. Cosmic Int'l, Inc., 542 F.2d 868, 872–877 (2d Cir. 1976); Menendez v. Saks & Co., 485 F.2d 1355, 1364 (2d. Cir. 1973), rev'd on other grounds, Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682 (1976); Maltina, 462 F.2d at 1027; Republic of Iraq, 353 F.2d at 51–52; Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co., 392 F.2d 706, 716

---

[3] The brothers' reliance on the Supreme Court's recent decision in Bank Markazi v. Peterson, 136 S.Ct. 1310 (2016), is misplaced.  In that case, the Court upheld a statute, 22 U.S.C. § 8772, which Congress passed in order to make certain specific assets subject to attachment in order to satisfy terrorism related judgments against Iran, regardless of whether those same assets would have been attachable under TRIA.  Id. at 1317.  But neither the act of state doctrine, nor the extraterritorial exception to it, were at issue in that case, and nothing about the Court's decision upholding Congress's authority to make those assets attachable remotely suggests that TRIA itself reflects Congress's intent that an exception to the extraterritorial exception to the act of state doctrine should be created.  If anything, the fact that Congress specifically intervened to make certain that the assets at issue in Bank Markazi could be attached cautions against reading TRIA itself to manifest a similarly specific intention regarding the assets at issue in this case.

(5th Cir. 1968).  We therefore affirm the District Court's ruling and dismissal of the case.[4]

**IV.**

We turn now to Computershare's cross-appeal.  At issue is the District Court's denial of Computershare's motion to extend its time to file a motion for attorneys' fees.

Under Rule 54, a motion seeking an award of attorneys' fees must be made "no later than 14 days after the entry of judgment."  Fed. R. Civ. P. 54(d)(2)(B)(i).  And that clock begins to run when the separate document required by Rule 58 is issued. See United Auto. Workers Local 259 Social Sec. Dept. v. Metro Auto Ctr., 501 F.3d 283, 287 (3d Cir. 2007).  "Although Rule 58 does not require that a separate judgment use any particular words or form of words . . . . the judgment should be self-sufficient, complete, and describe the parties and the relief to which the party is entitled."  Mullane v. Chambers, 333 F.3d 322, 336 (1st Cir. 2003).

As we have said, Computershare filed its motion for attorneys' fees on July 31, 2015 -- 24 days after the order of

_____

[4] Because we decide the case on this ground, we need not address the alternative argument made by Computershare and the United States that the "penal law rule" provides a separate ground for declining to give effect to Law 568.  See United States v. Federative Republic of Brazil, 748 F.3d 86, 92 (2d Cir. 2014).

dismissal was entered. For that reason, the District Court denied it as untimely.

Computershare argues on appeal that this denial was erroneous, because, Computershare contends, the 14-day clock never started running. Computershare contends that is so because the July 7 "Order of Dismissal" did not satisfy the separate document rule and thus did not start the clock for filing a motion for attorneys' fees. In the alternative, Computershare argues that the District Court abused its discretion by refusing to grant Computershare a ten-day extension to file its motion for attorneys' fees. Finally, Computershare separately argues that it should be able to request attorneys' fees now, as it does not have a judgment charging or discharging it as trustee, but will once this Court passes on the case. We address each of these arguments in turn.

**A.**

Computershare first argues that the July 7 order was not a separate document under Rule 58 -- and thus did not trigger Rule 54's 14-day clock for seeking attorneys' fees -- because the July 7 order was not labeled "judgment." But this Court has previously rejected the argument that an order must be so labelled to constitute a separate document under Rule 58, see Mirpuri v. ACT Mfg., Inc., 212 F.3d 624, 628 (1st Cir. 2000), and many other circuits have, too. See LeBoon v. Lancaster Jewish Community Center Ass'n, 503 F.3d 217, 224 (3d Cir. 2007); Bourg v.

- 18 -

<u>Continental Oil Co.</u>, 192 F.3d 127, 1999 WL 684161, at *2 (5th Cir. 1999) (unpublished); <u>Grun</u> v. <u>Pneumo Abex Corp.</u>, 163 F.3d 411, 422 & n.8 (7th Cir. 1998).

Computershare also argues that the July 7 "Order of Dismissal" was not a separate document under Rule 58 because it was not "self-contained." Computershare rests this contention on the fact that the order referred to the District Court's Memorandum and Order entered the same day. But here, one need not refer to the Memorandum and Order to determine the terms of the dismissal, as the July 7 order on its face makes clear that the case is dismissed. Thus, the Seventh Circuit's decision in <u>Massey Ferguson Div. of Varity Corp.</u> v. <u>Gurley</u>, 51 F.3d 102, 104-05 (7th Cir. 1995), is of no help to Computershare. In that case, it was necessary to refer to the district court's related opinion to determine in which part the motion in question was granted and in which part it was denied. <u>Id.</u> The District Court thus correctly concluded that the July 7 "Order of Dismissal" constituted a separate document under Rule 58.

**B.**

We turn then to Computershare's contention that -- if the July 7 order was a separate document -- the District Court abused its discretion by refusing to allow Computershare to file the motion for attorneys' fees ten days late. The District Court declined to allow the late filing because "Computershare ha[d] not

shown good cause or excusable neglect for failing to make a fee request within the required period."

The only reason Computershare gives for its lateness here is the misunderstanding of its counsel. But, "[o]nly in 'rare cases' have we found that a district court abused its discretion in refusing to grant an extension of time." Cortes-Rivera v. Dep't of Corrs. & Rehab. of Com. of P.R., 626 F.3d 21, 26 (1st Cir. 2010) (quoting Perez-Cordero v. Wal-Mart P.R., 440 F.3d 531, 534 (1st Cir. 2006)). And generally those cases have involved circumstances in which "a litigant was 'reasonably surprised' by a court's deadline or 'the events leading to the contested decision were unfair.'" Id. (quoting Perez-Cordero, 440 F.3d at 534). We thus cannot say that the District Court abused its broad discretion by refusing to excuse Computershare's lateness on this ground. Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc., 730 F.3d 23, 27 (1st Cir. 2013) ("[A] lawyer's 'inattention or carelessness,' without more, 'normally does not constitute excusable neglect.'" (quoting Dimmitt v. Ockenfels, 407 F.3d 21, 24 (1st Cir. 2005)).

## c.

Finally, Computershare asks for permission "to file a fee application with this Court for its fees incurred in the District Court." Computershare relies on the Massachusetts trustee process statute. Under that statute, a trustee process

defendant (such as Computershare) is entitled to costs, including attorneys' fees, when it is "adjudged a trustee" (when it has assets subject to attachment) or "discharged" (when it does not). See Mass. Gen. Laws ch. 246 §§ 69, 70.

Computershare argues that the District Court's dismissal of the case did not itself "discharge" Computershare. Computershare thus argues that, because it has not yet been either adjudged a trustee or discharged, its request for attorneys' fees was "premature" and thus that it should be allowed to seek attorneys' fees now.

This argument fails, however, on Computershare's own logic. Computershare has not explained how the affirmance of a judgment it agrees did not discharge it now would discharge it. Nor has Computershare explained how we, as an appellate court, could consider a request for discharge in the first instance, without such a request having been presented first to the District Court. And, finally, Computershare does not purport to be appealing from the District Court's dismissal order on the ground that the District Court erred in not ordering discharge as Computershare requested. Nor could Computershare do so, as it did not timely file a notice of appeal from the dismissal. See 28 U.S.C. § 2107; Fed. R. App. P. 4; Bowles v. Russell, 551 U.S. 205 (2007) ("This Court has long held that the taking of an appeal within the prescribed time is 'mandatory and jurisdictional.'"

- 21 -

(quoting <u>Griggs</u> v. <u>Provident Consumer Disc. Co.</u>, 459 U.S. 56, 61 (1982) (per curium))).[5]

## V.

For the foregoing reasons, the District Court's order and judgment of dismissal and denial of Computershare's motion for attorneys' fees are **<u>affirmed</u>**.

---

[5] In its cross-appeal reply brief Computershare argues in the alternative -- and contrary to the position that it takes in its opening brief -- that the District Court's dismissal of the case did "implicitly discharge[] Computershare." Computershare thus argues that it is due attorneys' fees even at this late date. Computershare makes no argument, however, that, if the District Court's order had discharged it, it was entitled to more than the 14 days Rule 54 provides to file its motion for attorneys' fees. And, in any event, new arguments may not be raised for the first time in a reply brief. <u>See</u> <u>Rivera-Muriente</u> v. <u>Agosto-Alicea</u>, 959 F.2d 349, 354 (1st Cir. 1992).