# United States Court of Appeals
## For the First Circuit

No. 18-1277

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL GORDON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

Michelle Menken, with whom The Law Office of Michelle Menken was on brief, for appellant.
Alexia R. De Vincentis, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

March 27, 2020

LYNCH, **Circuit Judge**. A federal jury convicted Michael Gordon in 2017 of conspiracy to possess with intent to distribute marijuana, conspiracy to distribute marijuana, conspiracy to commit money laundering, and nine counts of money laundering. He now advances four challenges to his convictions. He argues that the district court should have suppressed certain evidence against him, that it improperly excused certain potential jurors during voir dire, that it erred by admitting certain expert testimony, and that there was insufficient evidence for a reasonable jury to find him guilty of money laundering.

We conclude that each of his arguments fails. We affirm.

I.

A. Facts

We draw the facts relevant to the appeal of the denial of the motion to suppress primarily from the magistrate judge's supportable findings, which the district court adopted. Our review is "consistent with record support, with the addition of undisputed facts drawn from the suppression hearing." United States v. Hernandez-Mieses, 931 F.3d 134, 137 (1st Cir. 2019) (citing United States v. Dancy, 640 F.3d 455, 458 (1st Cir. 2011)). We state facts relevant to Gordon's sufficiency challenge "in the light most favorable to the jury's verdict." United States v. Ciresi, 697 F.3d 19, 23 (1st Cir. 2012). We add facts relevant only to

Gordon's voir dire and expert testimony challenges in our discussion of those claims.

On August 11, 2011, Gordon entered a security checkpoint at Logan International Airport ("Logan") in Boston with a boarding pass for a flight to San Francisco and a small piece of carry-on luggage. During the security screening, Transportation Security Administration ("TSA") screeners discovered a significant amount of cash in his luggage. The money was in six bundles of hundred-dollar bills, each bound with elastic bands and concealed in three pairs of pants. TSA called the Massachusetts State Police ("MSP") for assistance, and two MSP detectives, Sergeant Richard Galeazzi and Trooper John Morris, arrived within fifteen minutes. Both were wearing plain clothes with no visible weapon.

Sgt. Galeazzi asked to see Gordon's identification and boarding pass. Gordon complied. Sgt. Galeazzi returned the identification and boarding pass to Gordon. Sgt. Galeazzi told Gordon that he was free to go at any time and was not required to answer questions. Sgt. Galeazzi then told Gordon that they wanted to ask him questions about the money in his bag and asked him if he would be willing to answer questions. Gordon agreed. His bag remained in the screening area.

Sgt. Galeazzi and Gordon spoke for about ten minutes. Gordon told Sgt. Galeazzi that he owned Mike's Auto Body in the Dorchester neighborhood of Boston and was going to San Francisco

- 3 -

to buy used cars at an auction for resale at his body shop. He said he bought cars in San Francisco because they were cheaper than in Boston. Gordon also said he was meeting someone in San Francisco who would take him to the auction, but could not identify that person. He said he did not know where he would stay in California. Sgt. Galeazzi also asked how much money Gordon was carrying, and Gordon answered that it was $27,000.

While Sgt. Galeazzi spoke with Gordon, Trooper Morris used his cell phone to request a criminal history check on Gordon. The check revealed that Gordon was suspected of marijuana trafficking and had been arrested in May 2011 in California for attempting to purchase 250 pounds of marijuana.

Based on his conversation with Gordon, the criminal history check, the amount of money and the way it was bundled, and an apparently mistaken belief that Gordon was traveling on a one-way ticket, Sgt. Galeazzi decided to seize the money as suspected drug proceeds. Sgt. Galeazzi asked Gordon if he wished to accompany the detectives to the MSP barracks to obtain a receipt for the money, but Gordon declined and decided to continue to San Francisco. He had missed his flight, but took a later flight.

A trained canine later sniffed the money at the MSP barracks and alerted to the presence of narcotics. A count of the money revealed that it was $60,000, not $27,000 as Gordon had

claimed. The matter was later referred to Homeland Security Investigations (HSI) for civil forfeiture proceedings.

Gordon later filed a claim for the money and, on October 24, 2011, Gordon's lawyer, Michael Paris, contacted HSI Special Agent Richard Atwood. Paris gave Atwood a copy of Gordon's 2010 tax return, the tax registration of Gordon's business, a list of Gordon's past auction purchases, and other documents.

On November 14, 2011, Special Agent Atwood invited Gordon and Paris to participate in an interview about the source of the money. Atwood asked them to bring documentation of the money's legitimate source, such as personal and business tax returns and sale contracts for Gordon's car purchases. Through Paris, Gordon agreed to be interviewed.

On January 11, 2012, Gordon and Paris met with Atwood and Special Agent Peter Darling. Gordon offered his 2009 personal tax return, copies of a few titles for vehicles purchased in 2010, and a power of attorney form from Caraballo Auto Sales and Repair for title signing at auctions. He did not offer any business tax returns or other documentation of car purchases.

Atwood asked Gordon to describe what happened at Logan five months earlier. Gordon said he had been traveling to San Francisco on a round-trip ticket and that TSA had searched his bag mistakenly. In fact, Gordon said, it was the bag in front of his that had caused an alert. He said he had purchased his tickets a

couple of days before the flight and was going to stay in California for two days to attend an auto auction.

Atwood then asked Gordon whether the MSP had asked him about the money found in his bag. Gordon said they had. Atwood asked where Gordon stored the money before going to the airport. Gordon first answered that he kept some of it in a safe deposit box, but changed his answer and said he kept some of it in a safe at his house. Darling asked Gordon if he had withdrawn any of the money from a bank before traveling, and Gordon answered, "I could of," and that he used Bank of America.

Atwood asked Gordon why he had told the officers that the money was only $27,000, not $60,000. Gordon said he did not remember saying it was $27,000. Atwood asked Gordon whether he had counted the money before packing it, and Gordon hesitated several times before saying he had. Atwood asked Gordon why he had not waited to get a receipt from the MSP, and Gordon replied that he wanted to make his flight.

Atwood asked Gordon why he told the MSP that it was cheaper to buy used cars in California. Gordon said he did not say that and explained that he bought cars in California because of the greater availability there of high-end cars.

Atwood asked Gordon how he paid for the cars he bought at auctions. Gordon said he brought cash because he did not know how much the cars he wanted to buy would sell for, so he would buy

a money order after winning the auction. Darling asked Gordon why he did not visit a Bank of America branch after winning and get a bank check or money order drawn on his account. Gordon answered that the Oakland area, where the auction was, did not have Bank of America branches. The agents' research showed that Oakland has numerous Bank of America branches.

Darling asked Gordon if he completed currency transaction reports, required for transactions over $10,000, when obtaining a bank check or money order in Oakland. Gordon answered that he went to multiple banks to purchase multiple orders, each for less than $10,000, and avoid showing identification and filling out a currency transaction report.

Atwood asked Gordon how, given that his 2010 tax return showed a business loss of $33,000 while his 2009 tax return showed business income of $17,358, he had $60,000 cash in his home. After pausing, Gordon answered that the money was from buying and selling cars and that he would not mess with the IRS.

Atwood asked Gordon whether he had ever been arrested. Gordon said he had been, mostly for drugs. Atwood asked about Gordon's May 2011 arrest in California. Gordon said he had been with friends and family who had drugs on them. He said he had been pulled over near Los Angeles with two friends, whom he identified as Juan, without providing a last name, and a friend of Juan's, for whom he provided no name at all. He said Juan and his

friend had been giving Gordon a ride, but he could not identify their destination. When Darling asked Gordon whether he had known that 250 pounds of marijuana were in the vehicle, Paris stopped the questioning on that subject.

Asked which car carrier company Gordon used to ship purchased cars back to Massachusetts, Gordon said he used his own. He said that, although he did not have a commercial driver's license (CDL), his trailer truck carried only two vehicles and did not require a CDL.

Neither Gordon nor Paris ever gave the agents any bank documents showing large balances in a business or personal account or documentation of withdrawals before the August 11, 2011, seizure at Logan.

After the interview, Atwood began nearly daily surveillance of Mike's Auto Body -- Gordon's Dorchester-based business -- using a pole camera and physical observation. On August 8, 2012, during that surveillance, Atwood observed Gordon arrive with a medium-sized shipping box and bring it into the shop. Another person then arrived in another vehicle and placed what appeared to be the same box into his own vehicle, which was then towed. Officers stopped the tow truck at Atwood's request, and the box was found to contain over two kilograms of marijuana.

Atwood's investigation also revealed that Gordon made over thirty trips between Boston and the San Francisco area in the

period of July 2010 and March 2014, either with no return ticket or a return one to three days after arriving. Agents also observed on multiple occasions Gordon shipping boxes from post offices and FedEx facilities near San Francisco before he flew back to Boston. They later tracked those packages to various locations in and around Boston and intercepted several that contained marijuana. The investigation also revealed two locations in California where marijuana was being grown that appeared to be connected to Gordon. Ultimately, the investigation found that Gordon shipped over 300 packages from California to Boston, likely containing at least 1,000 kilograms of marijuana in total.

On November 6, 2014, law enforcement executed a search warrant on Gordon's house, where they found a suitcase of marijuana, a bucket of marijuana, a firearm and ammunition, and rolls of vacuum-sealer plastic.

Law enforcement also reviewed Gordon's bank records, which showed expenditures that exceeded the approximately $100,000 annual profit of Mike's Auto Body by several hundred thousand dollars. The accounts showed frequent cash and money order deposits, typically in multiples of a hundred. They also showed that Gordon used funds from the accounts to buy properties: $129,500 towards a home in Coral Springs, Florida, in April 2012; $148,423 towards another home in Coral Springs, Florida, in June 2012; and $330,000 for his home in Randolph, Massachusetts. He

also then used more than $290,000 to pay off mortgages on the Coral Springs homes and bought a $26,000 car using a cashier's check.

B.   Legal Proceedings

On September 23, 2015, a federal grand jury returned a fourteen-count superseding indictment charging Gordon with conspiracy to distribute and to possess with intent to distribute marijuana in violation of 21 U.S.C. § 846; conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h); and twelve counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.

On October 13, 2015, Gordon moved to suppress the fruits of the August 11, 2011, events at Logan.  The district court referred the matter to a magistrate judge, who conducted an evidentiary hearing at which Sgt. Galeazzi, Trooper Morris, and Gordon testified.  On August 30, 2016, the magistrate judge issued a report and recommendation that recommended denying the motions to suppress.  The magistrate judge found, inter alia, that Gordon provided law enforcement with much of the same evidence found at Logan when he met with Atwood and Darling five months later.  The magistrate judge found that the later meeting was sufficiently attenuated from the airport search that it was not fruit of the poisonous tree of the airport encounter.  As a result, the magistrate judge concluded that the fruits of the investigation did not require suppression because the agents pursued that

investigation based on information lawfully acquired from the later meeting with Gordon.  Gordon timely objected.

On May 1, 2017, the district court held a hearing on Gordon's objections and solicited briefing on the scope of its review of the magistrate judge's findings as to the motion to suppress, which the parties submitted.  On November 14, 2017, the district court adopted the magistrate judge's report and recommendation and denied Gordon's motion.

Gordon proceeded to trial, and on December 14, 2017, the jury found Gordon guilty on eleven of the fourteen counts.  On March 27, 2018, the district court sentenced Gordon to fifteen years' incarceration and five years' supervised release.

Gordon timely appealed.

## II.

Gordon first argues that the district court improperly denied his motion to suppress the fruits of the airport encounter. Although the government did not introduce at trial evidence of either the airport encounter or the later interview, Gordon argues that most of the evidence used at trial was the fruit of the airport encounter, and so it should have been suppressed.

In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law, including its ultimate constitutional determinations, de novo.  See United States v. Flores, 888 F.3d

- 11 -

537, 543 (1st Cir. 2018).  "In determining the outcome [of a motion to suppress] under the attenuation doctrine, the court of appeals does not defer to the district court."  United States v. Stark, 499 F.3d 72, 75 (1st Cir. 2007) (alteration in original) (quoting United States v. Paradis, 351 F.3d 21, 32 (1st Cir. 2003)).  "[W]e will uphold a denial of a suppression motion as long as 'any reasonable view of the evidence supports the decision.'"  United States v. Clark, 685 F.3d 72, 75 (1st Cir. 2012) (quoting United States v. Woodbury, 511 F.3d 93, 96-97 (1st Cir. 2007)).

Gordon advances several challenges to the denial of his motion to suppress.  He argues that he was illegally detained between the TSA search and the arrival of the MSP detectives and during the subsequent discussion, that the magistrate judge's finding of attenuation lacked adequate support, and that the district court did not conduct the de novo determination required under 28 U.S.C. § 636(b)(1) and erroneously believed that it did not have authority to rehear witness testimony.  We do not need to reach Gordon's Fourth Amendment arguments because the attenuation doctrine resolves against him all of his Fourth Amendment claims.  The use of the doctrine does not require the assessment of the credibility of any witness before the magistrate judge, so Gordon's procedural argument that the district court was required to rehear testimony is not relevant to our decision.

Courts "need not hold that all evidence is 'fruit of the poisonous tree'" where law enforcement would not have discovered the evidence but for some earlier illegal conduct. Stark, 499 F.3d at 76 (quoting Wong Sun v. United States, 371 U.S. 471, 487–88 (1963)). Rather, evidence may be admitted when later obtained "by means sufficiently distinguishable" from the initial means. Wong Sun, 371 U.S. at 488. In determining whether the later means is sufficiently attenuated from the earlier, we balance the following factors: (1) "[t]he voluntariness of the statement"; (2) "[t]he temporal proximity" of the earlier and later means; (3) "the presence of intervening circumstances"; and (4) "the purpose and flagrancy" of law enforcement's initial misconduct. Brown v. Illinois, 422 U.S. 590, 603–04 (1975).

All four factors point against suppression, and so the attenuation doctrine allows the admission of the challenged evidence. We need not resolve Gordon's contention that the airport encounter was illegal and instead assume without deciding that it amounted to an unconstitutional seizure. Because the information Gordon provided during the interview and the subsequent investigatory findings were not fruits of the poisonous tree, they could not be suppressed.

First, Gordon's January 2012 interview with Atwood and Darling was plainly voluntary. "Volition and knowledge must be judged by the totality of the circumstances and outward

- 13 -

manifestations." United States v. Monti, 557 F.2d 899, 904 (1st Cir. 1977). Gordon himself filed a claim for the money seized at Logan, and his lawyer contacted HSI to discuss its return and provided documents about Gordon's finances. Gordon was fully represented and accompanied by counsel, and his lawyer instructed him not to answer certain questions. There is no evidence that Atwood or Darling used any "overbearing or abusive treatment" or "forceful[] coerc[ion]." Id. at 903.

Second, the interview took place five months after the airport encounter, far longer than in other cases where we have found attenuation. See Stark, 499 F.3d at 76 (finding attenuation where confession was two days after illegal search); Paradis, 351 F.3d at 34 (finding attenuation where statements were made seven days after illegal seizure). Gordon had far more than enough time to consider with a clear head and advice of counsel whether to make statements to law enforcement after the airport encounter.

Third, between the airport encounter and the later interview, Gordon retained counsel and filed a claim for the money seized at Logan. He then contacted HSI and agreed to the agents' suggestion of an in-person interview. Given these intervening circumstances, it can be fairly said that his statements at the interview were "relaxed, composed, and uncoerced." United States v. Ayres, 725 F.2d 806, 810 (1st Cir. 1984).

Finally, nothing about the airport seizure suggests that it involved flagrant official misconduct. Rather, it appears to be a typical investigative reaction to the discovery of a significant amount of cash.

Gordon argues that the magistrate judge "did not explore the central question of whether Gordon submitted to Atwood's interview of his own accord or, instead, whether the interview was only obtained via exploitation of the airport encounters."[1] This is immaterial. First, as we have stated, our review of the attenuation question is de novo and without deference to the district court or the magistrate judge. Second, Gordon offered no evidence that genuinely disputes that his consent to the later interview was voluntary.

Gordon's later interview was sufficiently attenuated from the airport encounter to render the fruits of the interview admissible regardless of the circumstances of the airport encounter. Because that interview gave law enforcement essentially the same information as the airport encounter, any

---

[1] In his reply brief, Gordon argues for the first time that the magistrate judge resolved the attenuation issue based on the agent's affidavit after suggesting that he would deal with it at a later date, depriving Gordon of the chance to present evidence on the issue. But this argument is waived because "new arguments may not be raised for the first time in a reply brief." Villoldo v. Castro Ruz, 821 F.3d 196, 206 n.5 (1st Cir. 2016). At any rate, Gordon gives no indication of the evidence he would have introduced to dispute the contents of the affidavit.

possible unconstitutional conduct at the airport did not taint the fruits of the subsequent investigation.  Gordon's motion to suppress the fruits of the airport encounter was properly denied.

III.

Gordon next argues that the district court's voir dire unfairly excluded jurors by focusing not on "whether the jurors would follow the law," but rather on "whether their views or experiences would have any effect at all on the performance of their duties."  When we review a district court's findings of juror impartiality, "the deference due . . . is at its pinnacle." Skilling v. United States, 561 U.S. 358, 396 (2010).  Gordon has preserved his arguments as to only one juror, Juror D.  We review the district court's decision as to Juror D for "a 'clear abuse of discretion.'"  United States v. Kar, 851 F.3d 59, 68 (1st Cir. 2017) (quoting United States v. Godfrey, 787 F.3d 72, 81 (1st Cir. 2015)).  We review Gordon's arguments as to other jurors "only for plain error."  United States v. Casanova, 886 F.3d 55, 60 (1st Cir. 2018).

Before voir dire, the government requested that the district court ask prospective jurors about their views on marijuana and its legalization.  Without objection, the district court addressed the venire:

> This is a case about marijuana . . . and in
> the Commonwealth of Massachusetts the
> Commonwealth has undertaken to make certain

- 16 -

measures that make some transactions in marijuana legal.

. . . .

So, what I am really interested in at this point is whether any of you have such strong views about . . . the regulation of drugs, specifically marijuana, that would interfere with your ability to be fair and impartial, that is to say, you would say, "I heard all of that evidence. I heard what the judge said the law is. I have my own views." That is unfair, fundamentally unfair, but we have to know whether or not any of you have such strong views about that, public policy views about that, that would interfere with your ability to be fair and impartial.

Gordon argues that the district court abused its discretion in excusing four potential jurors based on their responses to this inquiry. He objected to only one of the excused jurors, Juror D, before the district court.

Juror D told the district court: "I smoke [marijuana] daily, every day. I'm trying to get employed in the cannabis industry. So, I'm not sure if that's going to be any kind of a problem." The district court responded, "Well, I think it poses some issues for this case, and so I am going to excuse you as a juror here."

After Juror D left sidebar, the defense objected to the juror's "being excused for cause without further questioning." The district court responded:

I don't think there is a need to do further questioning here. This is someone who has prospective financial interest, not

- 17 -

> dissimilar to the fellow to whom you did not object who is about to be an investor or is an investor in this area.[2]  So, on its face it seems to me that someone who has got a vested interest in the business itself, which is contested territory, should be excused, and for that reason I excuse him.

The court excused Juror D.

It is clear that there was no abuse of discretion in the district court's decision to excuse Juror D.  The district court explained that it excused Juror D because he intended to participate in the marijuana industry, a state-authorized business that is in some sense similar to the illicit activity being prosecuted in Gordon's case.  Although Gordon argues that the district court should have inquired further about whether Juror D could evaluate Gordon's case fairly despite his involvement in the marijuana industry, the district court made clear that it believed Juror D's comment sufficed on its own to make clear his lack of impartiality.  Given the obvious connection between the charged conduct and Juror D's professional intent, we cannot say that this was an abuse of discretion.

---

[2]     The district court had also excused Juror F, who was "one of the six principal investors and about a week away from being a member of . . . a Massachusetts medical [and recreational] marijuana distributor" and "d[id]n't really feel [he] could be impartial in a marijuana case."  Gordon did not object when the district court excused Juror F and does not raise this exclusion on appeal.

Gordon also objects to the district court's decision to excuse three other potential jurors.[3]  Because he did not object contemporaneously when they were excused, we review Gordon's challenges for plain error.

The gravamen of Gordon's argument as to these jurors is that the district court abused its discretion by focusing its voir dire questions on potential jurors' ability to put aside their outside experiences rather than on their ability to remain impartial.  But our review is only for plain error, and we owe substantial deference to the district court's decision on how to conduct voir dire.  See United States v. Parker, 872 F.3d 1, 7-8 (1st Cir. 2017).  Gordon offers no support for his argument that the district court was required to put identical questions to each potential juror.  At any rate, as we explain, the district court's voir dire inquired about each potential juror's ability to be impartial.

First, Juror P told the district court that her younger brother had served ten years in prison for distribution of methamphetamine and recently been released.  The district court asked whether that experience would "influence [her] judgment."

_____

[3]    In his reply brief, Gordon discusses the voir dire of additional jurors and appears to argue that other improprieties occurred.  But this argument is also waived for being mentioned for the first time in his reply brief.  Villoldo, 821 F.3d at 206 n.5.

- 19 -

Juror P responded that she "[thought] it could, to be honest." The district court excused Juror P without objection.

Second, Juror GG told the district court that he

> personally believe[d] that marijuana in itself can be an extremely useful drug. I have many friends who were near suicidal actually use marijuana to even out their life in a lot of ways. . . . I personally believe that the current culture around marijuana is bad . . . it doesn't fit the severity of the drug, in my opinion.

The district court asked whether that belief would "cause [him] to put [his] thumb on the scale." Juror GG responded that he "[felt] like it might." The district court again asked whether "on the marijuana issue . . . [he] would lean toward one side or the other." Juror GG said he would. The district court excused Juror GG without objection.

Third, and finally, Juror S told the district court that her "dad used to work in a company and got caught up in drug. That's how we end up here, as a refugee." The district court asked Juror S to explain further. She answered:

> So my dad used [to] work in a company that -- at the time there was something about against narcotic traffic, drugs, come here to the United States, stuff my dad was kind of the manager. And the people over there did attack, and he was being prosecuted, like, trying to look for him. And I was escaping from there and come to the United States.

The district court asked whether that experience would "affect [her] judgment in this case." Juror S answered, "I think it is

because every time I think about it, I remember the helicopter, that when he was going toward and explode." The district court excused Juror S without objection.

Gordon's challenge, which he raises for the first time on appeal, is that the district court's "pattern of disqualifications . . . exclud[ed] a vital component of the Massachusetts community," those who disagree with federal law's prohibition on marijuana. But we review the district court's decision to excuse Jurors P, GG, and S only for plain error, and all specifically expressed that they did not feel they could be impartial in Gordon's case. That these jurors were excused does not demonstrate that a portion of the jury pool was systematically excluded. We find no error, much less plain error, in the district court's decision to excuse these jurors.

IV.

Gordon next challenges the admission of certain expert testimony at his trial.

On the seventh day of trial, the government called Drug Enforcement Administration Special Agent Mark Tully, for whom the government had provided an expert disclosure to the defense. After the government qualified Tully as an expert, it began to examine him about how marijuana trafficking operations typically work. During the prosecutor's examination, the district court interrupted and instructed the jury:

> You have heard, ladies and gentlemen, the
> reference to someone who is an expert. Let me
> explain what an "expert" is. An "expert" is
> a person who can offer an opinion in the case.
> The Court doesn't give a Good Housekeeping
> Seal of Approval to someone who is designated
> an expert. It simply says this is a person
> who can offer an opinion before the jury. You
> can evaluate that testimony as you will, just
> like any other witness. There are some areas
> of expertise that go a little bit beyond that,
> and I am excluding this testimony by [the
> prosecutor] using Agent Tully as a backboard.

The government continued examining Tully on domestic manufacture of marijuana. When the government asked how traffickers typically move marijuana from California to the East Coast, the defense objected "on basically whether or not this is the subject of expert testimony." The district court overruled the objection and "permit[ted Tully] to testify as to his observations in the course of his work regarding this."

Over repeated objections from the defense, Tully testified that traffickers typically move marijuana eastward by privately owned vehicles, aboard private aircraft, or by shipping it through the mail or via a private parcel service, often to places called "stash locations" where they do not live. He testified that trusted members of the trafficking organization at the stash locations often break down the marijuana into smaller amounts for distribution. He also testified that marijuana traffickers often use large amounts of cash and that marijuana from the West Coast sells in Boston for $2,500 to $4,500 per pound.

Gordon argues that Tully's testimony was unnecessary because it contained "nothing especially obscure or complex" and because "the legal status and social acceptance of [marijuana] in Massachusetts meant that most jurors would have a rough idea of its origins, packaging, odor, cost, appropriate quantities for personal use, etc." He argues that Tully's testimony improperly gave rise to the inference that the money Gordon laundered must have been from marijuana distribution in Massachusetts.

"We review the admission of lay opinion and expert testimony for manifest abuse of discretion." United States v. Valdivia, 680 F.3d 33, 50 (1st Cir. 2012). "A district judge, who sees and hears the challenged evidence first hand in the context of the overall trial, enjoys broad discretion in determining the admissibility of expert testimony; an appellate court will overturn such a determination only if it represents a manifest abuse of discretion." United States v. Montas, 41 F.3d 775, 783 (1st Cir. 1994).

Federal Rule of Evidence 702 allows experts to testify based on "scientific, technical, or other specialized knowledge" if it "will help the trier of fact to understand the evidence or to determine a fact in issue." "We have admitted expert testimony regarding the operation of criminal schemes and activities in a variety of contexts, finding such testimony helpful to juries in understanding some obscure or complex aspect of the crime."

<u>Montas</u>, 41 F.3d at 783. We reject such testimony only when its "subject . . . is well within the bounds of a jury's ordinary experience" and so it "has little probative value" but "might unduly influence the jury's own assessment of the inference that is being urged." <u>Id.</u> at 784.[4]

Tully's testimony that marijuana trafficking frequently occurs within the United States from California to the East Coast was clearly probative of Gordon's guilt in the trafficking and money laundering scheme the government alleged he was involved with. Although an average Massachusetts juror might have passing familiarity with marijuana, in part because of its legalization under state law, it does not follow that the average juror is familiar with the specific means by which marijuana is trafficked illegally. Tully's expert opinion that trafficking schemes such as the one described by the evidence against Gordon are common would have helped the jury determine whether Gordon's scheme could have generated the proceeds described in the money laundering

---

[4] To the extent that Gordon argues that the admission of Tully's testimony violated Rule 403 because the testimony was unfairly prejudicial, this argument fails. Our review of this forfeited argument is for plain error, and we grant substantial deference to the district court's balancing of the testimony's probative value and the risk of unfair prejudice. <u>See</u> <u>United States</u> v. <u>Rodriguez</u>, 525 F.3d 85, 98 (1st Cir. 2008). We find no basis for concluding that the district court made an obvious error in determining that the Rule 403 balancing favored admission of the testimony.

charges.  The district court's admission of Tully's testimony was not an abuse of discretion.

V.

Finally, Gordon argues that he is entitled to a judgment of acquittal on the money laundering counts because no rational jury could have found him guilty beyond a reasonable doubt.  He argues that there was insufficient evidence that Gordon was involved in marijuana distribution in Massachusetts, the predicate crime for the money laundering counts.  See United States v. Carucci, 364 F.3d 339, 344 (1st Cir. 2004) (money laundering convictions under 18 U.S.C. § 1957 "necessitate proof beyond a reasonable doubt of the predicate crime").  In particular, he urges that the evidence that he was selling marijuana in Massachusetts was "slight."  He reasons that, had more of his profits been from legitimate, rather than illegal, activities, that would have undermined one or more of the money laundering counts.

Gordon moved for a judgment of acquittal in the district court, and our review of preserved challenges to the sufficiency of the evidence is de novo.  United States v. Pothier, 919 F.3d 143, 146 (1st Cir. 2019).  We view the evidence in the light most favorable to the government and ask whether a rational factfinder could find the defendant guilty beyond a reasonable doubt.  See id.

- 25 -

The jury heard evidence that Gordon shipped over 300 packages from California to Boston that contained at least 1,000 kilograms of marijuana, which could have sold for $2,500 to $4,500 per pound. It also heard evidence that law enforcement found in Gordon's house a suitcase and bucket, both containing marijuana. The jury also heard evidence that Gordon spent money far in excess of the earnings of Mike's Auto Body on multiple homes and a vehicle for which he paid in full. This evidence easily gives rise to a reasonable inference that Gordon shipped marijuana to Massachusetts so that it could be resold and then received a portion of the profits. A reasonable jury could have found beyond a reasonable doubt that Gordon distributed marijuana in Massachusetts and that his illegal activities were the source of most of the profits shown in his bank records. His challenge to the jury's verdict fails.

## VI.

Each of Gordon's attacks on his convictions is meritless. <u>Affirmed</u>.