# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 24, 2013　　　Decided November 19, 2013

No. 12-7101

FRAN HEISER, INDIVIDUALLY AND AS CO-ADMINISTRATOR OF
THE ESTATE OF MICHAEL HEISER, ET AL.,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:00-cv-02329)

———

*Dale K. Cathell* argued the cause for appellants. With him
on the briefs was *Richard M. Kremen.*

*James L. Kerr* argued the cause for appellees Wells Fargo
Bank, N.A., et al. With him on the brief was *Karen E. Wagner.*

*Benjamin M. Shultz,* Attorney, U.S. Department of Justice,
argued the cause for *amicus curiae* United States of America.
With him on the brief were *Stuart F. Delery,* Principal Deputy
Assistant Attorney General, *Ronald C. Machen,* U.S. Attorney,
and *Mark B. Stern* and *Sharon Swingle,* Attorneys.

Before: BROWN, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: In 1996, an explosion tore apart the Khobar Towers apartment complex in Dhahran, Saudi Arabia. Nineteen American military personnel died and hundreds of others were wounded. Investigations revealed that the terrorist organization Hezbollah had attacked the Towers with Iran's assistance. The opinion in *Estate of Heiser v. Islamic Republic of Iran* (*Heiser I*), 466 F. Supp. 2d 229, 252-54, 260-65 (D.D.C. 2006), describes Iran's intimate involvement in planning, supporting, and approving the attack.

The estate of Michael Heiser, one of the victims, and other victims' families and estates, sued Iran and several of its agencies and instrumentalities alleging their liability for the attacks. Plaintiffs obtained a default judgment, *id*. at 356, later modified under the 2008 National Defense Authorization Act, *Estate of Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 22-23, 30-31 (D.D.C. 2009). The judgment now totals approximately $591 million in punitive and compensatory damages. *Estate of Heiser v. Islamic Republic of Iran* (*Heiser III*), 885 F. Supp. 2d 429, 450 (D.D.C. 2012). The propriety of that judgment is not before us.

Plaintiffs, attempting to collect on this judgment, had writs of attachment issued to Bank of America, N.A., and Wells Fargo, N.A., seeking any assets held by the banks in which Iran had an interest. The banks responded with lists of accounts having some connection to Iran, after which plaintiffs moved for the banks to turn over the funds in these accounts. In response, the banks conceded that some accounts were potentially subject

to attachment. *Id.* at 447 n.6. These "uncontested accounts" are the subject of an interpleader action in the district court. *Id*. at 434, 449.

The remaining "contested accounts" are the subject of this appeal. *Id*. at 432. The accounts contain the proceeds of electronic funds transfers that were blocked under various sanctions programs the Treasury Department's Office of Foreign Assets Control implemented. *Id.* at 432-33, 446. These concepts need to be explained.

An electronic funds transfer is a series of transactions by which one party, called the "originator," transfers money through the banking system to another party, called the "beneficiary." *See* U.C.C. § 4A-104(a).[1] Suppose O wants to transfer $100 to B. If O and B have an account at Bank X, then the transaction is simple. O can instruct Bank X, which will debit O's account and credit B's account with $100. But suppose O has an account at Bank X, and B has an account at Bank Y. Unless Banks X and Y are members of the same lending consortium, they must involve a third "intermediary" bank with which Banks X and Y both have accounts. The transaction would proceed as follows: (1) O instructs Bank X to pay B; (2) Bank X debits O's account and forwards instructions to the intermediary bank; (3) the intermediary bank debits Bank X's account, credits Bank Y's account, and forwards instructions to Bank Y; and (4) Bank Y credits B's account. The entire process

---

[1] The following explanation is drawn from *Shipping Corp. of India, Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009) and 3 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 22-1 (5th ed. 2008). *See also Heiser III*, 885 F. Supp. 2d at 446-47; 7 LARY LAWRENCE, ANDERSON ON THE UNIFORM COMMERCIAL CODE §§ 4A-101:1, 4A-101:6, 4A-103:4, 4A-104:4 to 104:11 (rev. ed. 2007).

occurs rapidly through a sequence of electronic debits and credits.

In this case, electronic funds transfers were never completed because of blocking regulations.[2] The intermediary banks—affiliated with either Wells Fargo or Bank of America—electronically screened each funds transfer they received. The screening found references to one of several designated Iranian banks. Because of those references, the banks froze the transfers and deposited the proceeds in separate accounts. The money never reached the beneficiaries or their banks, but instead became the subject of litigation.

The blocking regulations cast a wide net. The regulations froze and prohibited the "transfer[]" of "property and interests in property" of designated entities. *See* 31 C.F.R. §§ 544.201(a), 594.201(a). These terms were defined broadly. *See id.* §§ 544.308, 544.309, 594.309, 594.312. Assets could be blocked even though Iran had no "traditional legal interests" in them. *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156,

---

[2] Blocking regulations are promulgated under the International Emergency Economic Powers Act, Pub. L. No. 95–223, tit. II, 91 Stat. 1625, 1625-26 (1977) (codified at 50 U.S.C. §§ 1701-1706), which gives the President "broad powers" to impose economic sanctions on actors who threaten American interests. *Consarc Corp. v. U.S. Treasury Dep't*, 71 F.3d 909, 914 (D.C. Cir. 1995). Although Iran-specific blocking regulations exist, *see* 31 C.F.R. pts. 535 (Iranian Assets Control Regulations), 560 (Iranian Transactions and Sanctions Regulations), 561 (Iranian Financial Sanctions Regulations), 562 (Iranian Human Rights Abuses Sanctions Regulations), the transfers in this case were blocked under two different programs: Weapons of Mass Destruction Proliferators Sanctions Regulations, 31 C.F.R. pt. 544; *see* Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005), and Global Terrorism Sanctions Regulations, 31 C.F.R. pt. 594; *see* Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001).

162-63 (D.C. Cir. 2003) (internal quotation marks omitted). Blocking was not based on legal ownership.

The breadth of the blocking regulations is evident here. Iranian entities were not the originators of the funds transfers.[3] Nor were they the ultimate beneficiaries. The transfers were blocked because the beneficiaries' banks were Iranian. They were blocked, in other words, because Iranian banks would have had a contingent future possessory interest in the funds.

These are the funds that plaintiffs seek in satisfaction of their judgment against Iran. Plaintiffs argue that the Iranian banks' contingent possessory interests are sufficient for them to attach the contested accounts under two statutes. The first, 28 U.S.C. § 1610(g), "subject[s] to attachment" "the property of a foreign state . . . and the property of an agency or instrumentality of such a state" against which a plaintiff holds a judgment under 28 U.S.C. § 1605A. The second, § 201(a) of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107-297, 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 Note "Satisfaction of Judgments from Blocked Assets of Terrorists, Terrorist Organizations, and State Sponsors of Terrorism"), "subject[s] to execution or attachment" "the blocked assets of [a] terrorist party (including the blocked assets of any agency or

---

[3] One of the *uncontested* accounts holds the proceeds of a funds transfer for which an Iranian entity was an originator's bank, and another holds proceeds of a transfer with which an Iranian entity had an unknown relationship. The question whether a judgment creditor can attach assets that bear those relationships to Iran is not before the court.

instrumentality of that terrorist party)" against which a plaintiff holds a judgment under 28 U.S.C. § 1605(a)(7).[4]

The United States submitted a statement of interest to the district court, and has filed a brief amicus curiae in this appeal. The government took "no position" on the question whether Iran owns the contested accounts. United States Amicus Br. at 1. It addressed only the proper construction of § 201 and § 1610(g). The government argued that the statutes "do not . . . permit a plaintiff to satisfy a judgment against a terrorist party by attaching property that the terrorist party does not own." United States Amicus Br. at 2. The government's interpretation of § 201 and § 1610(g) is the same as the banks'.

The district court held that the contested accounts were not attachable under either statute. It first held that the word "of" in § 201 and § 1610(g) denotes ownership and that Iran must therefore own any accounts plaintiffs may seek to attach. *Heiser III*, 885 F. Supp. 2d at 437-43. It then determined that ownership of the contested accounts should be governed by a federal rule of decision because the Foreign Sovereign Immunities Act, which includes both § 201 and § 1610(g), preempts state law. *Id.* at 443-45. The court adopted Uniform Commercial Code Article 4A as a federal rule of decision. *Id.* at 445-47. Applying Article 4A principles, the district court found that Iran did not own the

---

[4] The National Defense Authorization Act of 2008 repealed 28 U.S.C. § 1605(a)(7) and replaced it with 28 U.S.C. § 1605A. *Heiser II*, 659 F. Supp. 2d at 23. Plaintiffs' original judgment was awarded under the former provision. *Heiser I*, 466 F. Supp. 2d at 248, 265-66, 356-59. The modified judgment, including punitive damages, was awarded under the latter. *Heiser II*, 659 F. Supp. 2d at 23-24.

contested accounts. The court therefore denied plaintiffs' motion for a turnover of the funds. *Id.* at 447-49.[5]

The parties agree that most of the requirements of § 201 and § 1610(g) are satisfied. Iran is obviously a "foreign state." Section 201 defines a "terrorist party" as "a foreign state designated as a state sponsor of terrorism," 28 U.S.C. § 1610 Note (d)(4), and Iran has been so designated, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 67-68 (D.D.C. 2010). The funds are also property and blocked assets. *Heiser III*, 885 F. Supp. 2d at 433, 437, 442. As discussed above, plaintiffs hold a judgment under 28 U.S.C. § 1605(a)(7), which was modified under 28 U.S.C. § 1605A. *See supra* note 4.

Whether plaintiffs can attach the contested accounts thus depends on whether those accounts are the "property" or "blocked assets" *of* Iran. Plaintiffs ask us to treat the word "of" as encompassing any Iranian relationship with the contested accounts. Although the word "of" may signify ownership, plaintiffs claim that an ownership definition is inappropriate here. Instead, they say the word "of" should draw its meaning from the surrounding language. In § 201 Congress used "of" to modify "blocked assets," and assets may be blocked on the basis of Iranian interests far less significant than ownership. This

---

[5] The district court's holding that § 201 and § 1610(g) require Iran to own the contested accounts accords with *Calderon-Cardona v. JPMorgan Chase Bank, N.A.*, 867 F. Supp. 2d 389, 403-07 (S.D.N.Y. 2011). Three other opinions from the same district have disagreed and held that § 201 does not require an ownership interest for attachment. *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 562-68 (S.D.N.Y. 2012); *Levin v. Bank of N.Y.*, No. 09-CV-5900, 2011 WL 812032, at *13-19 (S.D.N.Y. Mar. 4, 2011); *Hausler v. JP Morgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 533-39 (S.D.N.Y. 2010).

language choice, according to plaintiffs, conveys Congress's intent to compensate victims of terrorism with blocked assets. Thus, plaintiffs conclude, the contested accounts may be attached for the same reason they were blocked: because an Iranian bank would have served as a bank to the ultimate beneficiary.

The banks and the United States both reject this interpretation, citing Supreme Court cases defining "of" in various statutes as requiring ownership. *See Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2195-96 (2011); *Poe v. Seaborn*, 282 U.S. 101, 109 (1930). The district court relied, in part, on these and other Supreme Court decisions. *Heiser III*, 885 F. Supp. 2d at 438. While the decisions establish that "of" denotes ownership in some statutes, the word may carry a different meaning in others. *See, e.g.*, *Prot. & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.*, 448 F.3d 119, 125-26 (2d Cir. 2006). None of the Supreme Court decisions the parties or the district court cited purport to define "of" conclusively and for all purposes. Its meaning depends on context.

With respect to § 201 and § 1610(g), plaintiffs' interpretation conflicts with the established principle that "a judgment creditor cannot acquire more property rights in a property than those already held by the judgment debtor." 50 C.J.S. *Judgments* § 787 (2013); *see United States v. Winnett*, 165 F.2d 149, 151 (9th Cir. 1947); *Zink v. Black Star Line, Inc.*, 18 F.2d 156, 157 (D.C. Cir. 1927); *Lewis v. Smith*, 15 F. Cas. 498, 498-99 (C.C.D.C. 1825) (No. 8,332). If a debtor merely holds property as an intermediary for a third party, but does not own the property, then a creditor cannot attach it. *See Carpenter v. Nat'l City Bank of Chi.*, 48 App. D.C. 133, 134-35, 136 (D.C. Cir. 1918). These principles carry significant weight because "statutes should be interpreted consistently with the common

law." *Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013) (per curiam) (quoting *Samantar v. Yousuf*, 560 U.S. 305, 130 S. Ct. 2278, 2289 (2010)). Congress can "abrogate" the traditional common-law principles governing execution of judgments, but to do so it must "speak directly to the question addressed by the common law." *Id.* at 179-80 (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993) (internal quotation marks omitted)).

Congress has not done so here. The statutory text is silent on this issue. Nothing in the legislative histories of § 201 or § 1610(g) suggests that Congress intended judgment creditors of foreign states to be able to attach property those states do not own. Indeed, a House Report addressing § 1610(g) states that the section was intended to let debtors attach assets in which foreign states have "beneficial ownership." H.R. REP. NO. 110-477, at 1001 (2007) (Conf. Rep.). The House Report on the Terrorism Risk Insurance Act does state that § 201's purpose "is to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism . . . by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties." H.R. REP. NO. 107-779, at 27 (2002) (Conf. Rep.). But this merely repeats the language of the statute. It does not show that Congress's "comprehensive[]" solution was to abrogate the common law.

Plaintiffs cite the floor debate over § 201 to argue that Congress wanted to compensate terrorism victims with blocked assets. But plaintiffs misinterpret the debate. Congress had a narrower concern. Even before the Terrorism Risk Insurance Act was passed, 28 U.S.C. § 1610(f)(1) purportedly allowed creditors holding judgments under § 1605(a)(7) (and, later, under § 1605A) to attach blocked property. But the President was authorized to "waive any provision" of § 1610(f)(1) "in the interest of national security." 28 U.S.C. § 1610(f)(3). The

President waived § 1610(f)(1) in almost all cases after finding that attachment of blocked property would "impede the ability of the President to conduct foreign policy" and "impede the effectiveness of . . . prohibitions and regulations upon financial transactions." Determination to Waive Requirements Relating to Blocked Property of Terrorist-List States, 63 Fed. Reg. 59,201 (Oct. 21, 1998).[6] Congress responded to this perceived "flaunting [flouting of?] the law," 148 CONG. REC. 23,121 (Nov. 19, 2002) (statement of Sen. Harkin), by passing § 201, which "builds upon and extends the principles in section 1610(f)(1) . . . and eliminates the effects of any Presidential waiver issued prior to the date of enactment." H.R. REP. NO. 107-779, at 27; *see also Ministry of Def. v. Elahi*, 556 U.S. 366, 386 (2009). The floor debate clearly demonstrates that at least some members of Congress wanted to use Iran's assets to pay its victims, whether or not the executive agreed. But that purpose is a far cry from paying Iran's victims with assets Iran does not own.

Adopting plaintiffs' interpretation of § 201 and § 1610(g) risks punishing innocent third parties. Plaintiffs' position is that these sections allow a creditor to satisfy a judgment with property the debtor does not own. But if the debtor does not own

[6] Section 1610(f) was passed as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, Treasury Department Appropriations Act, tit. I, § 117(d), 112 Stat. 2681-480, 2681-491 to -492. The original language allowing the President to waive the "requirements of this section," was codified as a note to 28 U.S.C. § 1610(g). *See id.* That language was repealed by the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, div. C, § 2002, 114 Stat. 1464, 1543, which added the current language allowing the President to waive "any provision of paragraph (1)." The President then executed a superseding waiver pursuant to this new language. Determination to Waive Attachment Provisions Relating to Blocked Property of Terrorist-List States, 65 Fed. Reg. 66,483 (Oct. 28, 2000).

that property, then someone else must. And that someone could, and very well might, be an innocent person who then unjustly bears the costs of the debtor's wrong. This court has construed "strictly against the garnisher" a statute "in derogation of the common law," because it risked penalizing "a garnishee who owed the principal defendant nothing." *Austin v. Smith*, 312 F.2d 337, 340-43 (D.C. Cir. 1962); *see also Rieffer v. Home Indem. Co.*, 61 A.2d 26, 27 (D.C. 1948) ("The weight of authority clearly favors a strict construction of attachment statutes."), *modified on other grounds*, 62 A.2d 371 (D.C. 1948). And the need to protect innocent parties is particularly acute with blocked assets. In a statement of interest submitted in a different case, the government explained that the Sudan Sanctions Regulations—which have similar breadth to the sanctions in this case, *see* 31 C.F.R. §§ 538.201, 538.301, 538.310, 538.313—could block "personal remittances by persons not subject to sanctions" merely because the remittances were sent through a Sudan-owned bank. Statement of Interest of the United States of America at 6-7, *Rux v. ABN Amro Bank N.V.*, No. 08-CV-6588 (S.D.N.Y. Apr. 14, 2009), ECF No. 132. These personal remittances could include tuition payments for health care training or money paid by a Sudanese embassy employee to purchase a personal vehicle. *Id.* Exhibit 1 at ¶¶ 14-15 (Decl. of John E. Smith).

The record does not disclose whether the originators or beneficiaries in this case are entirely innocent. But they may be. And that prospect would be contrary to Congress's intent. If potentially innocent parties pay plaintiffs' judgment, then the punitive purpose of these provisions is not served. Quite the opposite. To the extent innocent parties pay some part of a terrorist state's judgment debt, the terrorist state's liability is ultimately reduced. Congress could not have intended such a result.

Plaintiffs claim that even if Iranian ownership is required, they should still prevail because Iran actually owns the contested accounts. They argue that ownership interests include any interest in the property bundle, including the Iranian banks' contingent future possessory interests in the accounts, an interpretation that harmonizes with the broad definitions of "property" and "interests in property" contained in the blocking regulations. Plaintiffs urge us not to adopt U.C.C. Article 4A as a rule of decision, reasoning that federal law preempts this Uniform Commercial Code provision.

We agree with plaintiffs that Article 4A does not apply of its own force. But it is not correct to treat this as an issue of preemption. Federal law, specifically § 201 and § 1610(g), is controlling. The question is the content of this federal law.

Congress has not provided a rule for determining ownership under § 201 or § 1610(g). Nor has Congress directed the federal courts to adopt state ownership rules under this statutory scheme. *See* RICHARD H. FALLON, JR. ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 632-33 (6th ed. 2009); Paul J. Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision*, 105 U. PA. L. REV. 797, 797 n.1, 811 (1957). Our task is thus the "normal judicial filling of statutory interstices." Henry J. Friendly, *In Praise of* Erie—*and of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 421 (1964). We must fashion a "rule of decision" for applying § 201's and § 1610(g)'s ownership requirement, and that rule, though federal, may sometimes "follow state law." *Id.* at 410; *see Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-68 (1943).

Article 4A provides an appropriate rule of decision. Article 4A is a particularly convenient and appropriate measure of

ownership because it has been adopted by all fifty states and the District of Columbia, and addresses ownership of electronic funds transfers, the issue presented in this case. *See Heiser III*, 885 F. Supp. 2d at 447. The Uniform Commercial Code is often used as the basis of federal common-law rules. *See* Caleb Nelson, *The Persistence of General Law*, 106 COLUM. L. REV. 503, 510-11 & n.33 (2006). To be clear, we do not hold that the District's or any state's version of Article 4A applies of its own force. Rather, we hold that Article 4A is a proper federal rule of decision for applying the ownership requirements of § 201 and § 1610(g).

Applying the principles of Article 4A, we agree with the district court that Iran does not own the contested accounts. *Heiser III*, 885 F. Supp. 2d at 447-49. Iran was not the beneficiary or originator, but the owner of the beneficiary's bank for each funds transfer, and "[l]egal title does not pass to the beneficiary's bank until it accepts the payment order from the intermediary bank." *Id.* at 448; *see Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009); *Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1277 (11th Cir. 2003). The Iranian beneficiary banks never received a payment order because the funds transfers were blocked at the intermediary banks, and they never held legal title to the money in the contested accounts. *Heiser III*, 885 F. Supp. 2d at 448. Article 4A's subrogation provisions further support this view. If the intermediary bank is prohibited from completing a transfer, then the originator is subrogated to its bank's right to a refund. U.C.C. § 4A-402(d)-(e). As the district court explained, this provision means that claims on an interrupted funds transfer ultimately belong to the originator, not the beneficiary or its bank. *Heiser III*, 885 F. Supp. 2d at 448.

Because plaintiffs could not attach the contested accounts under either § 201 or § 1610(g) without an Iranian ownership interest in the accounts, and because Iran lacked an ownership interest in the accounts, the order of the district court is

*Affirmed*.