# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 12, 2022         Decided August 16, 2022

No. 21-7036

ESTATE OF JEREMY ISADORE LEVIN, ET AL.,
APPELLANTS

v.

WELLS FARGO BANK, N.A.,
APPELLEE

Consolidated with 21-7041, 21-7044, 21-7052, 21-7053

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-00420)
(No. 1:05-cv-02494)
(No. 1:21-cv-00126)
(No. 1:21-cv-00127)
(No. 1:21-cv-00128)

*Suzelle M. Smith* argued the cause and filed the briefs for Levin appellants.

*Matthew D. McGill* argued the cause and filed the briefs for appellants James Owens, et al.

*Myanna Dellinger*, *James Dodge*, *David Horton*, and

*Jeffrey Stempel*, pro se, were on the brief for *amici curiae* Commercial Law Professors in support of Levin appellants.

*Alex C. Lakatos* argued the cause and filed the brief for appellee Wells Fargo Bank, N.A.

*Brian P. Hudak*, Assistant U.S. Attorney, argued the cause and filed the brief for appellee United States. *Jane M. Lyons* and *Peter C. Pfaffenroth*, Assistant U.S. Attorneys, entered appearances.

*Christopher D. Man* was on the brief for *amicus curiae* Crystal Holdings Limited in support of neither party.

Before: PILLARD and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Concurring opinion filed by *Circuit Judge* PILLARD.

RANDOLPH, *Senior Circuit Judge*: These consolidated cases, on appeal from a judgment of the district court, present competing claims to a blocked electronic funds transfer. The parties are, on one side, the United States, which blocked the transaction because terrorists initiated it. On the other side are victims of Iran-sponsored terrorism who have obtained multi-million dollar judgments against the Iranian government.

Taif Mining Services, LLC, an Omani company, initiated the electronic transfer to consummate its purchase of the *Nautic*, an oil tanker registered in Liberia. Crystal Holdings Limited, a Liberian subsidiary of a Greek company, was the seller. A law firm, Holman Fenwick Willan LLP, based in London, facilitated

the sale.

The U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") maintains a list of "Specially Designated Nationals and Blocked Persons." *See* Exec. Order No. 13,224 (2001), *as amended by* Exec. Order No. 13,886 (2019); 31 C.F.R. § 594.201. OFAC listed the Islamic Revolutionary Guard Corps. Two members of the Iranian Revolutionary Guard formed Taif Mining in an apparent attempt to hide its affiliation with the Islamic Republic of Iran. Taif Mining itself is now on OFAC's list.

Taif Mining initiated its electronic funds transfers to Crystal Holdings pursuant to a sales agreement for the *Nautic*. The Holman Fenwick law firm served as the parties' escrow agent. Taif's downpayment of $2.34 million moved through the international financial system in September 2019 and reached Crystal Holdings' Swiss bank account without interruption.

In October 2019, Taif Mining wired Holman Fenwick $9.98 million, the balance of the *Nautic*'s purchase price. Holman Fenwick deposited the funds in its escrow account at Lloyds Bank PLC, in London. Taif directed the law firm to send, "[f]or and on behalf of Taif," the $9.98 million to the Credit Suisse account of Crystal Holdings in Switzerland. Taif also instructed Holman Fenwick to use Bank of New York Mellon as the "intermediary bank" for the transfer. Whether Holman Fenwick relayed this instruction to Lloyds Bank is not clear.

We have described before how funds are transferred electronically through intermediary banks when the parties to the financial transaction have accounts at different banks. *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 936 (D.C. Cir.

2013).[1]  Here, the bridge between the Lloyds Bank of London and the Credit Suisse Bank in Switzerland was the Wells Fargo bank in New York.

The $9.98 million electronic funds transfer was blocked in the instant after Wells Fargo debited its Lloyds account but before it credited its Credit Suisse account.  The blocking was done pursuant to 50 U.S.C. § 1702, and Executive Order No. 13,224 (2001), *as amended by* Executive Order No. 13,886 (2019).[2]  How federal authorities were able to anticipate the transfer and act before its completion is not disclosed.  After blocking the transfer, Wells Fargo placed the funds in an account in South Dakota, as the bank apparently does with all

---

[1] *Heiser* described the role of intermediary banks with this example:

> Suppose O wants to transfer $100 to B.  If O and B have an account at Bank X, then the transaction is simple.  O can instruct Bank X, which will debit O's account and credit B's account with $100.  But suppose O has an account at Bank X, and B has an account at Bank Y.  Unless Banks X and Y are members of the same lending consortium, they must involve a third "intermediary" bank with which Banks X and Y both have accounts.  The transaction would proceed as follows: (1) O instructs Bank X to pay B; (2) Bank X debits O's account and forwards instructions to the intermediary bank; (3) the intermediary bank debits Bank X's account, credits Bank Y's account, and forwards instructions to Bank Y; and (4) Bank Y credits B's account.

735 F.3d at 936.

[2] The Treasury Secretary's authority to block terrorist transactions has been delegated to the Director of OFAC.  31 C.F.R. § 594.802.

blocked assets.

Months later, in May 2020, the United States filed a forfeiture action for the blocked funds. *United States v. $2,340,000.00 Associated with Petroleum Tanker Nautic*, No. 20-cv-1139 (D.D.C. filed May 1, 2020); *see* 18 U.S.C. § 981(a)(1)(A), (C), (G)(i).[3]  The Wall Street Journal reported the government's forfeiture action and its indictment of the two Iranians who were behind Taif.  Mengqi Sun & Dylan Tokar, *U.S. Charges Two Iranians over Oil Tanker Purchase, Seeking $12 Million Forfeiture*, WALL ST. J. (May 2, 2020), https://perma.cc/B75B-KMVT.  The article stated that the funds were being held at Wells Fargo. *Id.*

After learning of the government's forfeiture action, attorneys for two groups of victims of Iranian terrorism and their relatives, holding judgments against Iran, filed separate writs of attachment in the United States District Court for the District of Columbia.  The *Owens* plaintiffs are victims of al-Qaeda's 1998 bombings of the U.S. embassies in Kenya and Tanzania.  They have nearly $1 billion in judgments against Iran. *See* Order, *Owens v. Republic of Sudan*, No. 01-cv-2244 (D.D.C. Mar. 28, 2014), R. Doc. 301; Order, *Mwila v. Islamic Republic of Iran*, No. 08-cv-1377 (D.D.C. Mar. 28, 2014), R. Doc. 88; Order, *Khaliq v. Republic of Sudan*, No. 10-cv-356 (D.D.C. Mar. 28, 2014), R. Doc. 40.  The *Levin* plaintiffs obtained nearly $30 million in judgments against Iran for the 1984 kidnapping and torture of Jeremy Levin by Iran-backed Hezbollah. *Levin v. Islamic Republic of Iran*, No. 05-cv-2494, 2008 WL 11493474

---

[3] As is evident from the case title, the United States also sought forfeiture of Taif's downpayment, which is now in Crystal's possession.

(D.D.C. Jan. 14, 2008).[4]

Plaintiffs sought to attach the funds at Wells Fargo pursuant to two federal statutes. The first, 28 U.S.C. § 1610(g) of the Foreign Sovereign Immunities Act ("FSIA"), "subject[s] to attachment" "the property of a foreign state . . . and the property of an agency or instrumentality of such a state" against which a plaintiff holds a judgment under 28 U.S.C. § 1605A. The second, § 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 Note "Satisfaction of Judgments from Blocked Assets of Terrorists, Terrorist Organizations, and State Sponsors of Terrorism"), "subject[s] to execution or attachment" "the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)" against which a plaintiff holds a judgment under 28 U.S.C. §§ 1605(a)(7) or 1605A. Section 201(a) specifies that such assets can be attached "[n]otwithstanding any other provision of law."

The United States intervened in both cases and moved to quash plaintiffs' writs of attachment. The government also asserted that plaintiffs were attempting to circumvent the "orderly administration" of the United States Victims of State Sponsored Terrorism Fund. *See* 34 U.S.C. § 20144.[5]

After consolidating the cases, the district court ruled that

---

[4] The *Levin* plaintiffs also filed writs of attachment in South Dakota and in the Southern District of New York. Those proceedings have been stayed pending the outcome of this case.

[5] The Fund provides a means for victims of state-sponsored terrorism to collect on their unpaid judgments through money the federal government obtains from terrorist states and actors, including through forfeiture proceedings. 34 U.S.C. § 20144.

Iran lacked any property interest in the blocked funds held by Wells Fargo. The court therefore quashed plaintiffs' writs of attachment. *See Levin v. Islamic Republic of Iran*, 523 F. Supp. 3d 14 (D.D.C. 2021). The court based its ruling on the Uniform Commercial Code Article 4A, and our opinion in *Heiser*, of which more in a moment.

The district court treated each transaction in this electronic funds transfer as "a stand-alone agreement between sender and recipient." *Id.* at 21. By this the court meant that when an electronic funds transfer is unsuccessful and an intermediary bank is involved, the intermediary bank "is obligated to refund payment only to the immediately prior sender." *Id.* at 22. Thus, the intermediary bank "has no obligation to" the entity that initiated the transfer (the "originator"). *Id.* The originator must recover from its own bank, that is, the bank that sent payment to the intermediary bank. *Id.*

But for the blocking, the electronic funds transfer would have moved this way:[6]



_____

[6] This graphic is drawn from page 7 of the Commercial Law Professors' *Amicus* Brief.

Relying on Uniform Commercial Code Article 4A, and especially § 4A-402, the district court "assume[d]" that Taif, rather than the Holman Fenwick law firm, was the "originator" of the funds transfer. *Levin*, 523 F. Supp. 3d at 21. The court concluded that Iran (via Taif) had no claim to the funds at Wells Fargo, and therefore had "no property interest" in them. *Id.* at 21–22. This was because Taif was not "the entity immediately preceding the bank 'holding' the EFT in the transaction chain." *Id.* at 21 (quoting *Calderon-Cardona v. Bank of N.Y. Mellon*, 770 F.3d 993, 1002 (2d Cir. 2014)). That entity was Lloyds Bank. *Id.* And so the district court held that in the absence of any Iranian property interest (through Taif Mining) in the funds, plaintiffs could not attach them under § 201 or § 1610(g) to collect their judgments against Iran. *Id.* at 20.

Both sides in this appeal, relying on *Heiser*, have set forth opposing views on whether, in light of U.C.C. Article 4A, Iran has a "sufficient property interest" in the blocked funds.[7] A "sufficient property interest," that is, to warrant plaintiffs' attachments under § 201 and § 1610(g).

The focus on *Heiser* is understandable. That case is similar to this one. In both, OFAC blocked an electronic funds transfer

---

[7] The *Owens* plaintiffs argue in the alternative that the U.C.C. does not apply:

> The U.C.C. was not designed to address terrorist behavior, and Article 4A was specifically drafted to prevent the interruption of funds transfers. But halting transfers is the entire point of sanctions blocking, and that is precisely what OFAC did in this case. As a result, Article 4A is ill-equipped to address the issues of ownership here.

*Owens* Appellants' Br. 20.

when it reached an intermediary U.S. bank. And in *Heiser*, as here, the plaintiffs relied on § 201 and § 1610(g) to collect their judgments. But there the material similarities end.

Unlike this case, the plaintiffs in *Heiser* were seeking to attach funds at intermediary banks under § 201 and § 1610(g) because the beneficiary's bank was Iranian. OFAC's blocking had prevented the funds from reaching the Iranian bank. This is why we described the Iranian banks as having only "a contingent future possessory interest in the funds." *Heiser*, 735 F.3d at 937.[8]

Pursuant to the U.C.C. Article 4A, the Iranian bank in *Heiser* "was not the beneficiary or originator" and under "the principles of Article 4A," the blocking foreclosed any claim that legal title had passed to the Iranian bank. *Id.* at 941. For this reason and in view of settled common law principles,[9] we ruled

---

[8] The intermediary banks in *Heiser* never contested that funds blocked at an intermediary bank, where the originator or the originator's bank was or may have been an agency or instrumentality of Iran, could be attached using § 201 and § 1610(g). *Heiser*, 735 F.3d at 936 n.3. In fact, there were many "*uncontested* accounts" with those characteristics that the banks requested the district court turn over to terrorist victim plaintiffs. *Id.*; *see* Joint Appendix at 160–61, 257, 277–78, *Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013) (No. 12-7101); Third Party Petition Alleging Claims in the Nature of Interpleader at 3–4, *Heiser v. Islamic Republic of Iran*, 00-cv-2329 (D.D.C. Aug. 31, 2012), R. Doc. 235.

[9] We described the common law thus:

> If a debtor merely holds property as an intermediary for a third party, but does not own the property, then a creditor cannot attach it. *See Carpenter v. Nat'l City Bank of Chi.*, 48 App. D.C. 133, 134–35, 136

against the plaintiffs. In our view Congress, in § 201 of TRIA and § 1610(g) of FSIA, could not possibly have "intended judgment creditors of foreign states to be able to attach property those states do not own." *Id.* at 938.

These differences between *Heiser* and this case are significant. As Professor Paul Mishkin, a "thoughtful legal scholar[]," [10] put it, when federal courts incorporate state law as federal common law, such incorporation must be done "as to a single issue at a time" and the court must consider whether the "issue's outcome" is consistent with the "federal program." Paul J. Mishkin, *The Variousness of "Federal Law": Competence and Discretion in the Choice of National and State Rules for Decision,* 105 U. PA. L. REV. 797, 804–06 (1957); *see* Caleb Nelson, *The Persistence of General Law*, 106 COLUM. L. REV. 503, 510–11 & n.33 (2006). It follows that we may use Article 4A if and only if, on the issue presented, doing so would be consistent with TRIA § 201 and FSIA § 1610(g). *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507–13 (1988); *Burks v. Lasker*, 441 U.S. 471, 479–80 (1979). As we held in *Heiser*, "Article 4A does not apply of its own force. . . . Federal law, specifically § 201 and § 1610(g), is controlling." 735 F.3d at 940.

---

(D.C. Cir. 1918). These principles carry significant weight because "statutes should be interpreted consistently with the common law." *Manoharan v. Rajapaksa*, 711 F.3d 178, 179 (D.C. Cir. 2013) (per curiam) (quoting *Samantar v. Yousuf*, 560 U.S. 305, 320 (2010)).

*Heiser*, 735 F.3d at 938.

[10] *Danforth v. Minnesota*, 552 U.S. 264, 275 n.12 (2008); *id.* at 294–95 (Roberts, C.J., dissenting).

To sum up thus far, *Heiser* did not settle whether U.C.C. Article 4A, or any provisions of it, would apply in a case such as this as matter of "federal common law."[11]  Henry J. Friendly, *In Praise of* Erie—*and of the New Federal Common Law*, 39 N.Y.U. L. REV. 383, 410 (1964)); *see Clearfield Tr. Co. v. United States*, 318 U.S. 363, 366–68 (1943); Caleb Nelson, *The Legitimacy of (Some) Federal Common Law*, 101 VA. L. REV. 1, 35–36, 63 & n.220 (2015).

Most of what is set forth in the lengthy U.C.C. Article 4A and its Commentaries, entitled "Funds Transfers," deals with technical banking subjects, of no concern here.  The parties in this case naturally focus on § 4A-402, the section dealing with electronic funds transfers that have miscarried.  This section, like other Article 4A sections, seeks to avoid disruptions to funds transfers.  Its function is to allocate risks and to facilitate the unwinding of uncompleted funds transfers in a fair and orderly manner. *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 101 (2d Cir. 1998).[12]

As applied in this case, the objectives of U.C.C. § 4A-402 and OFAC's blocking are incompatible.  While § 4A-402 seeks to minimize disruptions in electronic funds transfers, OFAC's blocking does the opposite – its purpose is to disrupt terrorist

---

[11] We acknowledge that the Second Circuit appears to have adopted U.C.C. Article 4A, or at least New York's version of it, as federal common law for all electronic funds transfers in cases such as this one within its non-diversity jurisdiction. *See, e.g.*, *Doe v. JPMorgan Chase Bank, N.A.*, 899 F.3d 152, 156–57 (2d Cir. 2018). We also acknowledge that our opinion aligns with the dissenting opinion in that case. *Id.* at 158–62 (Chin, J., dissenting).

[12] *Grain Traders* is not a federal common law case; it is a diversity case that applies New York law, specifically New York's version of Article 4A.  160 F.3d at 98.

electronic fund transactions. While § 4A-402 is designed to govern the unraveling of uncompleted electronic transfers,[13] when OFAC blocks electronic funds transfers there will be no unraveling.[14] That is the point of blocking. Thus, the Permanent Editorial Board for the Uniform Commercial Code,[15] in its Commentary No. 16, concluded that Article 4A should not be "honored" when "a regulation of the Treasury Department's Office of Foreign Assets Control ('OFAC')" disrupts an

---

[13] A funds transfer may not be completed because the intermediary bank becomes insolvent after the originator's bank credits the intermediary's account, there is a mistake in the payment order, or a bank accidentally sends a duplicate payment order. 3 JAMES J. WHITE ET AL., UNIFORM COMMERCIAL CODE § 23:15, 21 (6th ed. 2014).

[14] At least not in the United States. We have no information on potential causes of action in foreign jurisdictions.

[15] The Permanent Editorial Board

> is a joint committee of the American Law Institute and the Uniform Law Commission (also known as the National Conference of Commissioners on Uniform State Laws) that assists in attaining and maintaining uniformity in state statutes governing commercial transactions by discouraging non-uniform amendments to the Uniform Commercial Code by the states, and by approving and promulgating amendments to the UCC when necessary.

*Export–Import Bank of the U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 119 n.8 (2d Cir. 2010) (internal quotation marks omitted).

electronic transfer.[16]  That of course describes this case.

When one steps back from § 4A-402's elaborate – but inapplicable – methods for unwinding misfired electronic transfers, the path to our judgment seems clear.  OFAC's blocking is aimed at terrorists and their financial transactions. The TRIA "subject[s] to execution or attachment" "the blocked assets of [a] terrorist party," such as a State Sponsor of Terrorism like Iran, "including the blocked assets of any agency or instrumentality of that terrorist party" against which plaintiffs hold a judgment under 28 U.S.C. §§ 1605(a)(7) or 1605A. § 201(a), 116 Stat. 2337.  Again, section 201(a) specifies that such assets can be attached "[n]otwithstanding any other provision of law."

Wells Fargo Bank is merely a stakeholder.  It risks no financial loss.  Lloyds Bank is not on the hook – it received $9.98 million from the Holman law firm and it transmitted $9.98 million to Wells Fargo.  The Holman law firm held the $9.98 million as an escrow agent; it never owned the money.[17]  The only entity that is out of pocket as a result of OFAC's blocking is the Iranian front Taif,[18] and that is because it is subject to U.S. sanctions.  In terms of the TRIA, just quoted, the $9.98 million

---

[16] The district court relied on Commentary No. 16 in concluding that Iran (through Taif) had no property interest in the $9.98 million held at Wells Fargo. *Levin*, 523 F. Supp. 3d at 21.  The court may not have been aware of the Permanent Editorial Board's caveat regarding OFAC, quoted in the text above.

[17] Since these are for the most part instant transactions we disregard the effect of interest on the funds.

[18] At least according to U.S. law, which to our analysis is all that matters.

therefore represents "blocked assets of [a] terrorist party."[19]

The opposition of the United States rests on U.C.C. Article 4A, which we find inapplicable. The government agrees with the district court's decision to apply Article 4A and the conclusion reached. There is another problem with the position of the United States. The government's argument here and the district court's holding[20] that Iran (Taif) has no property interest in the blocked funds "is inherently at odds with OFAC regulations that require the 'property and interests in property' of [Specially Designated Global Terrorists] to be blocked in the first place. *See* 31 C.F.R. § 594.201(a). If [a terrorist's] interest in funds is, in effect, entirely extinguished while temporarily midstream, there would be no authorization to block those midstream funds as 'property [or] interests in property' of a designated terrorist party because that property would belong *solely* to the intermediary bank, not a designated terrorist party." *Doe*, 899 F.3d at 161 (Chin, J., dissenting) (third and fourth alterations in original).

Since U.C.C. Article 4A does not apply, the next question is what does. Our answer is that under § 201, which deals only with assets that have already been blocked by the United States, terrorist victims may attach OFAC blocked electronic funds transfers if those funds can be traced to a terrorist owner.

Tracing is used throughout federal law to attach consequences to those having or having had interests in property. The Supreme Court has commented: "Courts use tracing rules in cases involving fraud, pension rights, bankruptcy, trusts, etc."

---

[19] Because the funds can be attached using the TRIA, we need not decide whether attachment is permissible under § 1610(g) of the FSIA.

[20] *Levin*, 523 F. Supp. 3d at 21.

*Luis v. United States*, 578 U.S. 5, 22 (2016) (plurality opinion) (per curiam). The federal forfeiture statutes expressly incorporate tracing. *See, e.g.*, 18 U.S.C. §§ 981, 982; 21 U.S.C. § 881(a)(6); *United States v. Daccarett*, 6 F.3d 37, 55 (2d Cir. 1993).[21] Consistent with other situations when tracing is used, innocent third parties must be protected. Therefore, blocked funds can be attached only if no intermediary or upstream bank asserts an interest as an innocent third party. *See Heiser*, 735 F.3d at 938–39; *Doe*, 899 F.3d at 160–61 (Chin, J., dissenting).

Tracing resolves this case in plaintiffs' favor. The government admits that the $9.98 million blocked funds at Wells Fargo "are traceable to Taif" and thus to Iran. United States Br. 47. The premise of the government's forfeiture action is that the funds are traceable to Iran. *See* J.A. 51 ¶¶ 1–2; *id.* at 58–60 ¶¶ 47–59. Neither Wells Fargo nor Lloyds has asserted a claim to the blocked funds. The district court therefore erred in concluding that the plaintiffs had failed to show that the blocked funds were, under § 201(a) of the TRIA, "the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party)." 116 Stat. 2337. The district court's judgment rested entirely on this holding and its decision is all that we have addressed.

*Reversed and remanded.*

---

[21] The U.C.C.'s Permanent Editorial Board, in its Commentary No. 16, indicated that Article 4A does not apply in drug forfeiture cases, and that with respect to blocked electronic funds, the "*Daccarett* court, as appropriate in a forfeiture case, identified the amount of the funds as 'traceable' to an illicit activity and therefore subject to attachment under 21 U.S.C. § 881(a)."

**EPILOGUE**

In January 2020 the United Arab Emirates seized the *Nautic* pursuant to a civil court order. Crystal initiated an arbitration against Taif Mining to collect the $9.98 million balance. While the arbitration was pending, and while the *Nautic* was moored off the UAE coast, Iranians hijacked the ship.

PILLARD, *Circuit Judge*, concurring: I agree with the majority that the Uniform Commercial Code's Article 4A is an inappropriate rule of decision for determining whether funds owned by a terrorist party that initiates an EFT, during which the government blocks the funds based on 31 C.F.R. § 594.201, are property "of" a terrorist party for purposes of TRIA § 201. But in the place of Article 4A, I would make explicit that common-law ownership and agency principles apply instead of or in addition to tracing. Because the majority's rule apparently produces the same result in this case, I concur.

No party proposed we adopt tracing alone as our rule of decision in this context, and for good reason. That approach does not fulfill a key requirement of TRIA that we highlighted in *Heiser v. Islamic Republic of Iran*: that the terrorist party be shown to have "an ownership interest" in the funds sought. 735 F.3d 934, 941 (D.C. Cir. 2013); *see id.* at 938-40. Tracing typically involves a sort of forensic accounting—a process of identifying how an asset has been transformed, transferred, or substituted such that a claim against the asset can instead be made against the new one. "With the help of [tracing] rules, the victim of a robbery, for example, will likely obtain the car that the robber used stolen money to buy." *Luis v. United States*, 578 U.S. 5, 22 (2016). But tracing presupposes ownership; it does not identify any legal rule for establishing ownership, or even require that ownership be shown. The majority's holding that the relevant funds may be attached so long as they are "traceable to Taif," *supra* at 15, stops short of specifying any rule of decision to substitute for U.C.C. Article 4A in providing the statutorily required showing of ownership under *Heiser*.

Specifying only the tracing approach creates needless uncertainty. As we observed in *Heiser*, "[t]he blocking regulations cast a wide net," and are "not based on legal ownership." 735 F.3d at 936. The fact that the government has blocked funds is not itself assurance that the funds are or were

owned by terrorists. Victims of terrorism seeking to attach OFAC blocked electronic funds must also show the funds can be traced to a terrorist *owner*, *id.* at 941, a showing the government itself need not make prior to the blocking.

The court's opinion helpfully limits its tracing-based TRIA rule to circumstances in which "no intermediary or upstream bank asserts an interest as an innocent third party," *supra* at 15. But it does not explain the legal basis of that limitation. And it leaves unclear, for example, whether a bank could make such an assertion after the TRIA plaintiffs had recovered against the property. We must avoid a rule that "risks punishing innocent third parties"—the result *Heiser* read TRIA to prevent. 735 F.3d at 939 (citing cases establishing that we strictly construe attachment statutes to protect innocent parties).

In a case in which the tracing rule alone does not eliminate such risk, an apt federal rule of decision was presented to us: the application of common-law ownership and agency principles in lieu of the U.C.C. Article 4A-based rule applied in *Heiser*. *See Owens* Appellants' Br. 36-40. The relevant TRIA provision seeks to hold terrorist parties accountable by subjecting their assets to attachment. Treating banks effectuating EFTs as agents rather than owners in this context would ensure that even in financial transactions like EFTs that are designed to be quick and difficult to interrupt, that design does not defeat the ability of TRIA claimants to reach funds during terrorist-initiated EFTs that the blocking regime succeeds in interrupting. This rule would allow the law to keep its eye on the ball as Congress plainly intended: The banks are just the tools for carrying out the transaction. Whether it is transferred by EFT or some more traditional means like a check, property in a transaction that a terrorist party funds,

initiates, and primarily benefits from is appropriately subject to claims under TRIA.

The logic of this approach echoes the common law's treatment of certain banking relationships in the decades before the U.C.C. added specialized treatment of electronic fund transfers. In *Commercial National Bank v. Armstrong*, for example, the Supreme Court recognized that "the relation created between the banks as to [a check to be cashed] was that of principal and agent," which created a "trust obligation" over the funds to be transferred and permitted those funds to be "specifically trac[ed]" back to the principal's rightful ownership. 148 U.S. 50, 56 (1893). Because of that agency relationship,

> [w]hether it be said that such funds are specifically traceable in the possession of the subagent, or that the agent has never reduced those funds to possession, or put itself in a position where it could rightfully claim that it has changed the relation of agent to that of debtor, the result [was] the same.

*Id.* at 57. The result was that traceable funds intended as cash payment on that check belonged to the principal, rather than the agent bank, even if those funds were stopped mid-transfer. *Id.* at 57-58; *see also, e.g.*, *City of Miami v. First Nat. Bank*, 58 F.2d 561 (5th Cir. 1932).

Under that approach, for purposes of TRIA § 201, plaintiffs must establish not only that funds have been blocked based on "any interest" that a terrorist party may have in them, 50 U.S.C. § 1702(a)(1)(B), but also that the funds are owned by the terrorist—not by an innocent EFT initiator, *see Heiser*, 735 F.3d at 936, or other innocent party. Any bank

downstream from a terrorist party originator of an EFT, for example, is not treated as owner of the funds, as it would be under U.C.C. Article 4A. Rather, under general common law rules applicable to non-EFT money transfers, it would be treated as an agent or subagent of the originator-owner. Here, Taif was the owner of the funds it asked Holman Fenwick to electronically transfer, and for current purposes it thus retained ownership of the contested funds, even as the funds passed through the hands of its agents and subagents until they were frozen in Wells Fargo's possession. Thus, applying common law ownership and agency principles would treat Taif—and only Taif—as holding an ownership interest in the blocked funds.

I therefore concur in reversing the district court's determination that the blocked funds were not "of" a terrorist party. *Supra* at 15. I write separately to emphasize that, in my view, tracing alone is a conceptually incomplete rule of decision. But I do not take the court's tracing approach to be inconsistent with additional reliance on a federal rule based on common-law ownership and agency principles—to the extent it might be needed in future litigation—to harmonize today's decision with *Heiser* and reduce legal uncertainty for innocent owners and third parties like Wells Fargo.